**Rex T. KEARNEY, Jr., Plaintiff–
Appellant,**

v.

**STANDARD INSURANCE COMPANY,
Defendant–Appellee.**

**Nos. 96–16539, 96–16701.**

United States Court of Appeals,
Ninth Circuit.

Filed April 12, 1998.

Amended May 19, 1998.

Amended June 3, 1998.

Rehearing En Banc Granted and
Opinion Withdrawn Aug. 3, 1998.

Argued and Submitted Sept. 24, 1998.

Filed April 28, 1999.

Marjorie E. Manning, Bolling, Walter & Gawthrop, Sacramento, California, for the plaintiff-appellant.

Michael A. Conley (briefed and argued), Shawn Hanson (briefed), Pillsbury, Madison & Sutro, San Francisco, California, for the defendant-appellee.

Timothy D. Hauser, United States Department of Labor, Washington, D.C., for amicus Secretary of Labor.

Before: HUG, Chief Judge, SNEED, FLETCHER, REINHARDT, KOZINSKI, O'SCANNLAIN, TROTT, FERNANDEZ, T. G. NELSON, KLEINFELD AND SILVERMAN, Circuit Judges.

KLEINFELD, J., delivered the opinion of the Court, which is joined in full by Chief Judge HUG, Judge SNEED, Judge KOZINSKI, and Judge TROTT. Parts I and II are additionally joined by Judge FLETCHER and Judge SILVERMAN. Part I is additionally joined by Judge REINHARDT. Parts II, III, and IV are additionally joined by Judge O'SCANNLAIN.

Opinion by Judge KLEINFELD; Partial Concurrence and Partial Dissent by Judge FLETCHER; Concurrence by Judge REINHARDT; Partial Concurrence and Partial Dissent by Judge O'SCANNLAIN; Partial Concurrence and Partial Dissent by Judge SILVERMAN; Dissent by Judge FERNANDEZ.

KLEINFELD, Circuit Judge:

This is an ERISA case. We voted to rehear it en banc to reconcile our decisions on the district court standard of review, whether de novo or abuse of discretion, of a plan administrator's decision. We also consider what record that the district court should consider.

## Facts.

Mr. Kearney was a trial lawyer, and the managing partner of his law firm. As part of its benefits package, the firm bought a group disability insurance policy from Standard Insurance Company. The law firm was the policy owner. Under the policy, Standard promised to pay a percentage of an employee's predisability earnings, if the employee became disabled. For attorneys, the policy definition of "disability" says "[y]ou are only required to be DISABLED from your specialty in the practice of law."

One day Mr. Kearney was in a judge's chambers with opposing counsel, when the judge told him he "looked like hell." When opposing counsel gave him exhibits to look at, he had trouble focusing and felt faint. Mr. Kearney was then 54 years old, with a history of heart trouble, so he went immediately to his physician. He had had a heart attack eleven years earlier, and an angioplasty four years earlier. This time, he was diagnosed with unstable angina pectoris, which basically means chest pain caused by inadequate oxygen supply to the heart. The arteries serving his heart were diseased and partially blocked. He was admitted to the hospital and coronary bypass surgery was performed, grafting in new blood vessels.

The parties disagree about how well Mr. Kearney recovered after surgery. The insurer takes the position that Mr. Kearney has recovered fully enough to practice in his specialty again, but Mr. Kearney's position is that he has not. Mr. Kearney returned to his law practice for a while, then retired. Mr. Kearney takes the position that since his surgery, fatigue, exhaustion, and memory and concentration problems, prevent him from practicing as a trial lawyer.

Mr. Kearney applied for disability benefits. Standard paid them for two years. Then after obtaining more medical information from Mr. Kearney and from physicians it consulted, the insurer took the position that Mr. Kearney was no longer disabled, and quit paying him.

Mr. Kearney asked Standard to review its denial. It did so and reached the same conclusion. A "Quality Assurance Specialist" in the insurer's "Group Quality Assurance Unit," which reviewed the denial, wrote him that the "Quality Assurance Unit" performed "an independent review conducted separately from the individuals who made the original claim determination." The thorough letter reviews the medical evidence in three-and-a-half single-spaced pages. It concludes that Mr. Kearney's heart and brain both test out satisfactorily on objective measures, and his lifestyle (playing several sets of tennis every weekend and racing cars at speeds of up to 120 miles per hour) is inconsistent with his claimed inability to perform the functions of a trial lawyer.

Mr. Kearney sued Standard under 29 U.S.C. § 1132(a)(1)(B) for benefits. The statute cited is the provision of ERISA providing for civil actions to recover benefits under an ERISA plan. The parties filed cross motions for summary judgment. The insurer argued that it was entitled to deferential review for abuse of discretion, and that review should be confined to what it called the "administrative record," that is, the papers the insurer had when it denied the claim. The court determined that review should be de novo, because the policy was ambiguous about whether discretion was conferred. The court further determined that review should be confined to what the insurer had before it, because Mr. Kearney had had sufficient opportunity to provide evidence to the insurer. On the substantive question of whether Mr.

Kearney was disabled, the dispute boiled down to whether his memory and intelligence, and his ability to work very hard and bear stress, had so deteriorated, that he could not function effectively as a trial lawyer. The district court concluded that Mr. Kearney's IQ of 130, his playing several sets of tennis every weekend, his car-racing up to 120 miles per hour about ten times a year, and medical opinion that he ought to be able to return to work, left no genuine issue of material fact about whether he was disabled. Though his physical and mental stamina were reduced, the court granted summary judgment to the insurer because they were not so reduced as to disable him from practicing law.

Mr. Kearney appealed. The insurer argued that under *Snow v. Standard Ins. Co.*, 87 F.3d 327 (9th Cir.1996), the policy vested discretion in itself as the administrator, so district court review was limited to abuse of discretion. The panel decision, rejecting that argument, said, "[w]e have never held that so imprecise and ambiguous a provision as contained in Kearney's policy vests discretion in the administrator, and we decline to do so now." *Kearney v. Standard Ins. Co.*, 144 F.3d 597, 605 (9th Cir.), *withdrawn*, 152 F.3d 1098 (9th Cir. 1998). But Standard's brief had pointed

out that the policy "contains exactly the same language" as the policy in *Snow*. The petition for rehearing pointed out that the disability policy construed in *Snow*, in which we had reached the opposite result, involved a policy from the same insurance company containing identical language. We rehear this case en banc in order to eliminate the conflict between these two decisions that construed identical policy language.

### Analysis.

The parties, and the panel opinion, have assumed that the insurer was an "administrator" for purposes of ERISA. Because the question whether the insurer is an administrator has not been disputed in district court or in the briefs, we assume for purposes of discussion that it is, although the characterization is not without doubt.[1]

### I. Standard of review.

The insurer argues that, as administrator, it is entitled to deferential review, limited to whether it abused its discretion based on the materials it had before it. The district court concluded that its review

---

1. The statute provides that the administrator is the person so designated in the instrument. 29 U.S.C. § 1002(16)(A)(i)-(ii). The instrument (in this case the insurance policy) says in Part 6 that the policy "and the application" constitute the contract. The application designates the law firm, not Standard Insurance Company, as "plan administrator." This is consistent with the common arrangement, whereby the employer, union, or some employer-union trust, is the administrator of an ERISA plan. The statutory default, in the absence of designation of an administrator, is that the "plan sponsor," which is the employer in a case like this, is the administrator. 29 U.S.C. § 1002(16)(A)(ii), 29 U.S.C. § 1002(16)(B)(i). The ERISA plan, according to the "ERISA information and ERISA notice of your rights" published by Standard for employees of the firm said that they had the right to "have the PLAN ADMINISTRATOR review and consider any denial of your claim." The designated administrator, Mr. Kearney's law firm, had ceased its practice

and had no employees by the time Standard issued its final denial.

A Standard house counsel's affidavit in the record says that the ERISA notice of rights quoted above contained a scrivener's error, and "should have read" "Standard" where it said "the plan administrator." Mr. Kearney disputes whether Standard is entitled to the benefit of what it meant to say as opposed to what it did say, and argues in his reply brief (but not his opening brief) that the law firm was the administrator, but does not argue that this bears on the standard of review issue.

We need not decide, because the briefs do not put the issue before us, how the case might proceed were the insurer not deemed to be the administrator. *Compare Moran v. Aetna Life Ins. Co.*, 872 F.2d 296 (9th Cir. 1989) *with Vega v. National Life Ins. Services, Inc.*, 145 F.3d 673, 677 n. 24 (5th Cir.1998). We proceed on the same basis that the parties did, that Standard was the administrator.

should be de novo, without deference to Standard's decision.

The policy says that Standard will pay disability benefits "upon receipt of satisfactory written proof that you have become DISABLED." Standard argues that the word "satisfactory" implies discretion in Standard to decide whether the claimant really is disabled within the policy definition based on the proof submitted. Therefore, Standard argues, if the insurer reasonably exercised discretion to deny a claim, a court cannot substitute its own judgment, or consider other proof, and grant the claim.

The statute does not say how courts are supposed to review administrators' claim denials. We therefore begin our analysis with *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), which does. In *Firestone*, a question arose whether employees of plants sold by Firestone to Occidental Petroleum, who were rehired by Occidental, were entitled to severance pay under Firestone's ERISA plan. Firestone interpreted the plan to mean that they were not.

The Supreme Court granted certiorari in part to "address the appropriate standard of judicial review of benefit determinations by fiduciaries or plan administrators under ERISA." *Id.* at 105, 109 S.Ct. 948. Firestone argued that because ERISA defined a fiduciary as one who "exercises any discretionary authority," 29 U.S.C. § 1002(21)(A)(i), it could be inferred that, as a fiduciary, they had discretion and their decisions could be reviewed only for arbitrariness and capriciousness. A number of circuits had adopted the arbitrary and capricious standard. But the Supreme Court rejected it. It held that because there was "no evidence that under Firestone's termination pay plan the administrator has the power to construe uncertain terms or that eligibility determinations are to be given deference," judicial review had to proceed without any defer-

ence to Firestone's determination. *Firestone*, 489 U.S. at 111, 109 S.Ct. 948.

Noting that "ERISA abounds with the language and terminology of trust law," the Court used the Restatement (Second) of Trusts and other trust law authorities to apply "[t]rust principles." *Firestone*, 489 U.S. at 110–11, 109 S.Ct. 948. *Firestone* establishes that "[a]s they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation." *Id.* at 112, 109 S.Ct. 948. That means that except where the plan gives the trustee discretion to interpret the terms of its trust, courts review trust provisions de novo, which is to say they decide for themselves what a term of the trust means instead of deciding whether the plan administrator was reasonable in how it construed the term. " 'The extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust *as the court may interpret them,* and not as they may be interpreted by the trustee himself or by his attorney.' " *Firestone*, 489 U.S. at 112, 109 S.Ct. 948 (quoting 3 W. Fratcher, Scott on Trusts § 201, at 221) (emphasis added by *Firestone*).

*Firestone* holds that a deferential standard of review for actions by the trustee is "appropriate when the trustee exercises discretionary powers." *Id.* at 111, 109 S.Ct. 948. Though the Court cites Restatement (Second) of Trusts § 187 for this proposition, the Court puts a slightly different gloss on the proposition than does the Restatement. The Restatement says that "exercise of a power is discretionary except to the extent to which its exercise is required by the terms of the trust or by the principles of law applicable to the duties of trustees." Restatement (Second) of Trusts § 187 comment a (1959). Thus under the Restatement, in default of anything to the contrary, the trustee has discretion in the exercise of the

powers the trust confers. But the Court holds in *Firestone* that "denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948. That means the default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision.

■ Thus our task now is to examine the instrument to determine whether it confers discretion on Standard to decide whether a claimant is disabled. The language Standard relies on for its argument that the instrument confers discretion is the word "satisfactory" in the requirement in the insuring clause that a claimant provide "satisfactory written proof" of disability:

Part 6. LONG TERM DISABILITY INSURING CLAUSE

Subject to all the terms of the GROUP POLICY, STANDARD will pay the LTD BENEFIT described in Part 8 upon receipt of satisfactory written proof that you have become DISABLED while insured under the GROUP POLICY.

A majority of us have concluded that the phrase "will pay the LTD BENEFIT described in Part 8 upon receipt of satisfactory written proof that you have become DISABLED" is ambiguous. At least three interpretations are reasonable.

One reading natural to a lawyer experienced in insurance litigation would be that "satisfactory written proof" is a variant of the very old phrase "satisfactory proof of loss." Such phrases have been used in insurance policies for at least a century. The phrase traditionally confers discretion on the insurance company to decide whether the quantum of proof is sufficient, as

opposed to whether the loss is covered. The word "satisfactory" is traditionally limited by an objective standard, so that the insurance company is not permitted to reject proof that would be satisfactory to a reasonable person. *See* Charles R. Elliott, A Treatise on the Law of Insurance 319 (1907); William R. Vance, Handbook on the Law of Insurance 897 (Buist M. Anderson ed., 3d ed.1951) (1904); 13A Couch on Insurance § 49A:27 (2d ed. rev. 1982); 3 Insurance Law and Practice § 1443 (John Alan Appleman & Jean Appleman, rev. ed.1967).

A second reading of "will pay ... upon receipt of satisfactory written proof that you have become DISABLED" applies "satisfactory" to whether the proof establishes a covered disability as well as whether there is enough of it, but construes the word "satisfactory" as objective rather than subjective. Thus "satisfactory written proof that you have become disabled" means "proof that would be satisfactory to a reasonable person that you have become disabled." Though the Sixth Circuit rejected this reading, Judge Boggs in dissent urged it persuasively. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 559 (6th Cir.1998) (en banc) (Boggs, J., dissenting). This reading is consistent with well established common law principles for reading contracts, which are the principles that we are required, under *Firestone*, to apply. As a matter of common law, where a contract contains a condition that the obligor be "satisfied," "an interpretation is preferred under which the condition occurs if ... a reasonable person in the position of the obligor would be satisfied." Restatement (Second) of Contracts § 228 (1981). There is an exception to this objective construction, where the subject matter can only be subjectively and not objectively satisfactory (e.g., "if you paint a portrait of my daughter with which I am entirely satisfied, I'll pay you $5,000 for it"), *id.* at illustration 4, but satisfactory proof of disability is not inherently subjective, so the exception does not apply. This objective reading subjects the obligor to a

more stringent test than that his dissatisfaction must be genuine and in accord with the duty of good faith and fair dealing. Even honest dissatisfaction will not avoid his obligation, if a reasonable person in his position would be satisfied. *Id.* at comments a & b.

A third reasonable construction is the one articulated in the dissent, that "will pay . . . upon receipt of satisfactory written proof that you have become DISABLED" means that, subject to its fiduciary duty,[2] if the administrator is not satisfied (and has not abused its discretion in so deciding), then it does not have to pay. The dissent's position is in accord with *Perez*, 150 F.3d 550, although the phrasing of the clause there was slightly different. We concede the syntactical reasonableness of the dissent's reading. But the dissent goes too far, by suggesting that if anything is committed to the administrator's discretion, then everything is. And the dissent's reading runs contrary to the common law construction of conditions of "satisfaction." We reject the proposition that the dissent's is the *only* reasonable reading.

Only by excluding alternative readings as unreasonable could we conclude that the conferral of discretion is unambiguous. There are at least three fair readings of the phrase with quite different consequences. Thus we are compelled to conclude that, to the extent discretion is conferred, the conferral and its scope are at best ambiguous, and at worst (from Standard's viewpoint) the phrase does not confer discretion at all because it does not say that it does.

In *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1325 (9th Cir.1992), we held that an administrator had discretion only where discretion was "unambiguously retained" by the administrator. This is consistent with the established principles that ambiguities are construed *contra proferentem,* and that ambiguities are construed in favor of the insured. *Mongeluzo v. Baxter Travenol Disability Benefit Plan,* 46 F.3d 938, 942 (9th Cir.1995). We cannot conclude that Standard "unambiguously retained" discretion by means of the phrase "satisfactory written proof that you have become disabled," because the phrase is subject to at least two reasonable constructions to the contrary. Thus we conclude that the district court was correct in its determination that Mr. Kearney's claim should be reviewed de novo.

*II. The Record to be Reviewed.*

If a court reviews the administrator's decision, whether de novo as here, or for abuse of discretion, the record that was before the administrator furnishes the primary basis for review. Should the district judge review anything else? Standard moved for an order that the district court review only the materials Kearney had submitted to Standard. The district judge granted the order, following our decision in *Mongeluzo,* 46 F.3d at 943.

In *Mongeluzo,* we held, following the Fourth Circuit in *Quesinberry v. Life Insurance Company,* 987 F.2d 1017, 1025 (4th Cir.1993) (en banc), that the district court had discretion to allow evidence that was not before the plan administrator "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review." *Mongeluzo,* 46 F.3d at 944 (quoting *Quesinberry,* 987 F.2d at 1025) (internal quota-

---

**2.** Kearney also urges us to apply less deferential review because of Standard's potential conflict of interest (it is deciding whether it owes its own money to Kearney). *See Atwood v. Newmont Gold Co.,* 45 F.3d 1317 (9th Cir. 1995); *Lang v. Long–Term Disability Plan,* 125 F.3d 794 (9th Cir.1997). Because we conclude that Kearney is entitled to de novo review, which gives no deference at all to Standard's decision, we do not reach the question whether he would be entitled to less deferential review were he entitled only to review for abuse of discretion. Thus we have no occasion to reconsider the validity of *Atwood* and *Lang* in light of *Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

tion marks omitted). Though we allowed consideration of additional evidence because of circumstances peculiar to that case, we emphasized that "a district court should not take additional evidence merely because someone at a later time comes up with new evidence" and "[i]n most cases" only the evidence that was before the plan administrator should be considered. *Id.*

■ On appeal, Mr. Kearney argues that the district court ought to have taken additional evidence regarding the medical relationship between his cardiac condition and his cognitive ability. But the brief does not say what new evidence, nor was any specific new evidence proposed to the district court. The argument is merely a suggestion that the door be opened to whatever new evidence might be developed. But Kearney does not argue that we should reexamine *Mongeluzo.* Starting the evidence over from scratch would be contrary to *Mongeluzo.*

In his opposition to Standard's motion to limit the record, Mr. Kearney submitted pages of an "Occupational Outlook Handbook" published by the U.S. Department of Labor, which said that trial lawyers "need an exceptional ability to think quickly" and regularly work "under particularly heavy pressure" when a case is being tried. The district judge exercised his discretion to limit review to the evidence that was before the administrator for two reasons, that Mr. Kearney could as easily have submitted this material to Standard, and that the court did not need it to conduct an adequate de novo review.

The district judge did not abuse his discretion in so ruling. Both reasons he gave for confining the record to what was before Standard are good ones under *Mongeluzo* and are sensible in the circumstances of this case. No reason has been suggested why Mr. Kearney could not have submitted the pages of the Occupational Outlook Handbook to Standard. Insurance executives would likely be less familiar with what trial lawyers do, and more in need of such a source, than an experienced trial judge. A district judge would likely know, as this judge's remarks indicated he did, what trial lawyers do, without the assistance of a secondary source such as the Occupational Outlook Handbook. The handbook pages are an apt example of "additional evidence ... not necessary for adequate review of the benefits decision," as well as evidence that could as easily have been submitted to the administrator, which under *Mongeluzo* are disfavored.

Kearney argues that Standard did not provide the "full and fair review" required by 29 U.S.C. § 1133(2) because it did not obtain the heart films Dr. Weinreb referred to in his report, and did not obtain Dr. Fulton's test data referred to by Dr. Bittle. But Dr. Bittle wrote that he got Dr. Fulton's data from Mr. Kearney's own lawyer, so if Mr. Kearney thought Standard should have reviewed it, he should have sent it to them. As for Dr. Weinreb's films, Kearney argues that Standard's in-house medical advisor suggested that they be obtained, but the context of the suggestion was that he wanted them so he could better criticize Dr. Weinreb's report. Mr. Kearney also argues that Standard failed to comply with the notice provision of 29 C.F.R. § 2560.503–1(f)(3), because it did not tell him what additional material he needed to submit in order to perfect his claim. · The argument is without force, because Kearney's claim did not fail because he failed to submit needed evidence. It failed because Standard, having considered all the evidence, concluded that it needed no more and that Mr. Kearney was not disabled.

### III. Genuine Issue of Fact.

■ Mr. Kearney claimed disability based on fatigue, exhaustion, and mental disabilities following his coronary bypass surgery. He wrote that in tennis, "I am totally wiped out after one set when, before, I played a minimum of six sets on a weekend, sometimes as many as ten or twelve." Stress now caused chest discom-

fort and exhaustion. "I am unable to focus or concentrate as I did before, and my memory is definitely gone."

Mr. Kearney submitted medical authorizations and other materials so that Standard could develop a claims file enabling it to make a decision. His cardiologist, Stephen L. Morrison, M.D., reported to his internist, David Lehman, M.D., in December 1992, shortly after the surgery, that "I am also concerned about his memory and I am [sic] told him that I am impressed [sic] that this occurs frequently after bypass surgery, and I am hopeful that this will also significantly improve." A few months later, in April 1993, Dr. Morrison wrote that Mr. Kearney "has a tremendous complaint relative to memory loss that he associates with the coronary bypass surgery." The letter says "from a cardiac standpoint he appears to be doing very well," but "he seems very distraught and depressed" and recommended a tranquilizer. The next month, Mr. Kearney wrote to Dr. Lehman that his memory problem had grown worse.

In February of 1993, Mr. Kearney visited a neurologist, Peter C. Heublein, M.D. Dr. Heublein noted Mr. Kearney's complaints of memory problems and history of heart surgery and of several concussions from auto accidents when Mr. Kearney was a teenager. Dr. Heublein's impression was uncertain, because "my mental status examination now is normal," metabolic disturbance and early Alzheimer's disease were doubtful, and an episode of ischemia or embolus to the brain was possible, as was memory disturbance from anxiety and depression. He recommended a brain scan and psychometric testing to clarify a diagnosis.

An investigator interviewed Mr. Kearney in January 1994 for Standard. Mr. Kearney told him that he was subject to

exhaustion and lacking the mental sharpness and memory he once had. He was no longer practicing law actively, and had farmed out his cases. Although his psychiatrist had conducted a battery of tests and told him his memory was normal for a person his age, Mr. Kearney felt it was not up to the standards necessary to conduct trial work. Mr. Kearney was then living on $8,000 a month from Standard, $2,000 a month from other disability insurance with another insurance company, $3,000 a month from his stock portfolio and limited partnerships, interest on $200,000 in savings, state disability income of $300 a week, and a $500,000 fee he had earned as of December 1992.

In the fall of 1994, Mr. Kearney submitted to Standard a lengthy report from Irwin Weinreb, M.D., a cardiologist hired by a workers' compensation insurer (not Standard) to evaluate Mr. Kearney's workers' compensation claim. Dr. Weinreb's report focuses on whether Mr. Kearney's medical condition was "non-industrial." Mr. Kearney told Dr. Weinreb that he had not seen any doctor since seeing Dr. Lehman and Dr. Morrison, apparently in early 1993, a year and a half before. He told Dr. Weinreb that he had had a brain scan, which had come out normal, as did his MMPI,[3] and his psychiatrist had told him that his memory was normal for his age, but he felt his memory was now inadequate to do trial work. Dr. Weinreb opined that Mr. Kearney's heart condition precluded him from "very heavy work and very severe emotional stress" or a "very tight time schedule," though he "certainly could do legal work outside of trial work." Mr. Kearney's claimed intellectual deficit is mentioned only as history he gave to Dr. Weinreb, not as a finding by Dr. Weinreb.

---

**3.** The MMPI is the abbreviation for the "Minnesota multiphasic personality disorder inventory," defined as "[a]n empirical scale of an individual's personality based mainly on his own yes-or-no responses to a questionnaire of 550 items; designed to provide scores on all the more important personality traits and adaptations, and including special validating scales which measure the individual's test-taking aptitude and degree of frankness." Blakiston's Gould Medical Dictionary (3d ed.1972).

Standard had Mr. Kearney tested by a psychologist, Randall B. Smith, Ph.D., in May 1994 for evidence of the intellectual and memory deficits he claimed. Mr. Kearney reported that he worked in his office perhaps half an hour per day, raced cars at 110 to 120 mph, played tennis, and exercised. On examination, there was "no evidence of any word-finding pauses, aphasia, paraphasias, or articulation problems." Dr. Smith's clinical impression was that Mr. Kearney was in the "superior" intelligence range. When he gave Mr. Kearney pencil and paper tests, his intelligence scored as average on at least one test, extremely high on another, and his memory as "superior" and "unimpaired." His MMPI was normal. Dr. Smith noticed in Dr. Lehman's records that Mr. Kearney had complained of memory problems at least once in the early 1980's, while he was still active as a trial lawyer and long prior to his claim, and again in mid–1992 before his bypass surgery. "In essence," Dr. Smith concluded, "on formal testing I could find no evidence of cognitive deficiencies."

Mr. Kearney challenged Dr. Smith's conclusion that there was nothing wrong with his intellect or memory with a letter by Robert M. Bittle, M.D., a psychiatrist and neurologist. Dr. Bittle had examined Mr. Kearney for two hours, and had looked at Dr. Smith's report and at another psychologist's report Mr. Kearney's attorney gave him from a Dr. Fulton, which is not in the record. Dr. Bittle opined that Dr. Smith's foundation for his conclusions was inadequate, because there were some additional intelligence tests he should have given. Dr. Bittle says that the "raw data" from Dr. Fulton's tests in Dr. Bittle's opinion showed cognitive and memory deficits. Dr. Fulton's test data are not in the record. Dr. Bittle's own mental-status examination showed that Mr. Kearney's "estimated intelligence overall is superior," but he also observed "some immediate memory and concentration problems." Dr. Bittle wrote that "post-operative cognitive dysfunction and deficiencies with memory and concentration problems" are common complications from open-heart surgery, and while they usually clear up, sometimes they do not. Dr. Bittle opined that "it is highly medically probable that Mr. Kearney's memory/concentration and cognitive deficits do interfere significantly with his ability to function in the highly complex arena as a trial attorney."

Standard asked Dr. Smith to review Dr. Weinreb's and Dr. Bittle's letters and reassess his own opinion in light of them. Dr. Smith said he did the tests appropriate to Mr. Kearney's description of his problems, as opposed to those he might do after a head injury, and that doing the additional tests suggested by Dr. Bittle would be like doing a leg x-ray on someone with no symptoms in his leg. Mr. Kearney scored in the 98th percentile on analytic tasks, and showed minimal memory deficit which could result from psychological factors as well as hypothesized edema or hypoxia during heart surgery. He maintained his opinion that Mr. Kearney could resume work as an attorney "even in a trial setting." Dr. Smith noted, however, that he had not been furnished with the "raw test data" from Dr. Fulton that Dr. Bittle reported receiving from Kearney's attorney.

Based on this record, we conclude that there was a genuine issue of fact as to whether Kearney was disabled in the sense defined by the policy. Such evidence as Dr. Smith's and Dr. Heublein's could justify a reasonable trier of fact in concluding that Mr. Kearney's memory and intellect were unimpaired, and his car racing and intense tennis playing could justify the conclusion that he could handle the mental and physical demands of trial work. On the other hand, such evidence as Dr. Bittle's and Mr. Kearney's could justify the conclusion that Mr. Kearney's memory and intellect disabled him from trial work, and Dr. Weinreb's report could justify the conclusion that Mr. Kearney

could no longer handle the stress of trial work.

Because the record establishes a genuine issue of fact as to whether Mr. Kearney was disabled under the terms of the policy, we must reverse the summary judgment.

Mr. Kearney also argues that the district court should not have used only the "unable to perform your specialty" definition of disability, and that it should have also considered the "unable to earn more than 80%" of predisability earnings definition. Because Mr. Kearney did not challenge Standard's use of the "unable to perform" subsection in district court until his motion to vacate the judgment, he cannot challenge it for the first time on appeal.

Mr. Kearney also challenges the attorneys' fees award made against him pursuant to 29 U.S.C. § 1132(g)(1). *See Estate of Shockley v. Alyeska Pipeline Serv. Co.,* 130 F.3d 403 (9th Cir.1997). Because the district court judgment is vacated anyway, on account of the genuine issue of fact established by the record, the district court will necessarily revisit the issue of attorneys' fees after the case is concluded and exercise its discretion in the different circumstances then existing. We accordingly need not reach the issue.

*IV. Remand.*

Because the summary judgment is reversed because of a genuine issue of fact, the genuine issue of fact must be resolved by trial. But there is a complexity, because this is an ERISA case. If the trial starts from scratch, and any evidence is admissible whether it was furnished to the administrator or not, then the effect of a genuine issue of fact is to change the question. Instead of de novo review testing whether the individual was entitled to benefits based on the evidence before the administrator and such other evidence as might be admissible under the restrictive rule of *Mongeluzo,* "review" would be converted into a trial de novo based on evidence entirely unrestricted by what had been presented to the administrator.

The statute adopts a policy "to increase the likelihood" that beneficiaries "will receive their full benefits" and "to maintain the premium costs of such system at a reasonable level." 29 U.S.C. § 1001b(c)(3),(5). The procedure the statute requires for disputed claims includes "a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). The Supreme Court has reminded us of "the public interest in encouraging the formation of employee benefit plans" and also "the need for prompt and fair claims settlement procedures." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

A full trial de novo in any ERISA dispute where there was a genuine issue of fact as to whether the individual qualified for a benefit would undermine these policies. Trial de novo on new evidence would be inconsistent with reviewing the administrator's decision about whether to grant the benefit. The means that suggests itself for accomplishing trial of disputed facts, while preserving the value of the fiduciary review procedure, keeping costs and premiums down, and minimizing diversion of benefit money to litigation expense, is trial on the administrative record, in cases where the trial court does not find it necessary under *Mongeluzo* to consider additional evidence.

■ Although Rule 43(a) requires that "testimony" be taken in open court, the record should be regarded as being in the nature of exhibits, in the nature of documents, which are routinely a basis for findings of fact even though no one reads them out loud. We have affirmed bench trials on records in other cases. *See Adair v. Sunwest Bank (In re Adair),* 965 F.2d 777, 779 (9th Cir.1992). A majority of us conclude that, in its discretion guided by *Mon-*

*geluzo*, the district court may try the case on the record that the administrator had before it.[4] This is vastly less expensive to all parties, accomplishes the policies enacted as part of the statute, and also gives significance, which would otherwise largely evaporate, to the administrator's internal review procedure required by the statute.

■ Is there any point in remanding for such a trial, considering that the district judge may read exactly what he has already read, which did not persuade him that Mr. Kearney could establish even a genuine issue of fact as to whether he was disabled? A majority of us concludes that there is.[5] The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether Mr. Kearney is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true. The difference in the questions he is asking of the material may lead the judge to read it differently. The district judge will retain discretion to decide, subject to

*Mongeluzo*, whether, in order to answer this different question, he should take additional evidence. "[T]here is no such thing as ... findings of fact, on a summary judgment motion." *Thompson v. Mahre*, 110 F.3d 716, 719 (9th Cir.1997). But in a bench trial on the record, the judge will have to make findings of fact under Federal Rule of Civil Procedure 52(a). The process of finding the facts "specially," as that rule requires, sometimes leads a judge to a different conclusion from the one he would reach on a more holistic approach. Also, it completely changes our authority on review, from de novo review of summary judgment, to clearly erroneous review of findings of fact.[6] That change could be outcome determinative. Thus trial on the record, even if it consists of no more than the trial judge rereading what he has already read, and making findings of fact and conclusions of law instead of a summary judgment decision, may have real significance.

### Conclusion.

Though we conclude that the district court was correct as to its scope of review,

---

4. The author of this opinion writes with some trepidation about this novel form of trial. But it is more important that the law on a matter involving large numbers of transactions be clear and settled, than that each judge's personal views be articulated separately. As a practical matter, we have a majority for the view expressed in this section, and it is essential to claimants, administrators, and employers who fund ERISA plans, as well as district judges, that they have some authoritative statement of the law that they can safely apply.

5. Judge Silverman's concurrence and Judge Fernandez's dissent suggest that a remand is a waste of time, because the district judge has already evaluated the evidence and would merely be engaging in an empty formality to reach the same conclusion. That is a reasonable concern. But we currently are divided about whether the district judge's decision was correct on the evidence before him. Some of us think that the evidence before the administrator did not amount to satisfactory proof of disability. Some of us think that it did. This difference of opinion about whether there was satisfactory proof of disability es-

tablishes the desirability of having a trier of fact decide what the evidence proved. This kind of question, what the evidence proved as opposed to whether there was a genuine issue of fact, is ordinarily committed for decision to trial courts, not appellate courts.

6. Judge Reinhardt argues that this discussion of standard of review is dicta, and suggests that the standard of review may be de novo. The reason why standard of review is discussed is that it is among the reasons why remanding for findings of fact is more than an empty formality. As for what it is, we have in numerous prior cases held that when a district judge tries a case on a written record without live testimony and makes findings of fact, "we apply the 'clearly erroneous' rule, Fed.R.Civ.P. 52(a) in reviewing the judge's findings." *See, e.g., Starsky v. Williams*, 512 F.2d 109, 111 (9th Cir.1975); *Wolfe v. United States*, 798 F.2d 1241, 1243 n. 2 (9th Cir. 1986); *EEOC v. Maricopa County Community College District*, 736 F.2d 510, 513 (9th Cir. 1984).

de novo, and within its discretion in limiting the scope of the evidence to what was before the administrator, we nevertheless must REVERSE because on de novo review of the summary judgment, we conclude that there is a genuine issue of material fact. Accordingly, we REMAND for trial consistent with this opinion.

No costs.

FLETCHER, Circuit Judge, concurring in part and dissenting in part from Judge Kleinfeld's plurality opinion, and concurring in full in Judge Silverman's opinion:

Although I concur in Judge Silverman's opinion, in light of the fragmented views of the court, I must say more. Apparently the case will be remanded to the district court. A majority of the court agrees that the district court got it wrong in one respect or another and must reconsider.

The majority agrees that the district court's review must be de novo. The district court labeled its review de novo, and purported to review only for summary judgment. However it then proceeded to weigh the evidence and reach a decision on the merits, rather than to determine only whether material issues of disputed fact existed. Now the majority returns the case to the district court to do it again.

Let us disabuse the district court that its role is to grant or deny summary judgment. A district court, in a case that requires de novo review of the denial of ERISA benefits, is performing a different function. First, it must determine whether the record made before the administrator is adequate. Either on the record that was before the administrator or after admitting additional evidence, the district court then reviews the claim on the merits. It should review a record that is sufficiently developed "to enable the full exercise of informed and independent judgment." *Mongeluzo v. Baxter Travenol Disability Ben. Plan,* 46 F.3d 938, 943 (9th Cir.1995). Summary judgment, in contrast, is a vehicle for the timely disposition of cases as a matter of law. The exercise is to determine whether there are disputes of material fact that necessitate trial. *See* FED. R. CIV. P. 56 advisory committee's note. In the ERISA context, where the review is de novo, the issue is not whether judgment as a matter of law is appropriate, but whether additional evidence is required to enable the district court to render an informed decision on an adequate record. Such evidence should be received by whatever means is appropriate (live testimony or affidavits, for example). Once the record is sufficiently developed, the district court should render its decision to grant or deny benefits. The district court makes whatever factual findings are necessary and rules on the claim for benefits.

Since the majority insists the case is going back, the district court must start fresh. It must follow the dictates of *Mongeluzo* and must see that the record is developed fully "to enable the full exercise of [its] informed and independent judgment." *Mongeluzo,* 46 F.3d at 943.

REINHARDT, Circuit Judge, concurring in the result:

Judge Silverman's argument that Kearney is entitled to summary judgment on the current record is extremely persuasive, and I cannot disagree with his analysis. However, although the question is a close one, I conclude that the litigation may benefit from a trial on the merits. Given the absence of evidence in the record regarding the duties of a trial attorney, as well as the uncertain and conflicting nature of some of the medical evidence, a genuine issue of material fact may well remain as to whether Kearney's limitations disabled him from his "specialty" in the practice of law.

While I can concur in the decision to remand for a trial and in Section I of what Judge Kleinfeld contends is a majority opinion, I unfortunately cannot concur in the remainder of that opinion. At places, the opinion appears to me to be unclear or

uncertain and, as a result, is susceptible of conveying an inaccurate message. In other places, it contains dicta that is not only unnecessary but incorrect. In addition, I disagree with some of Judge Kleinfeld's legal and philosophical conclusions, such as his statement that a conflict existed between *Kearney* and *Snow*[1] and that a less "holistic" approach may be the solution to our problem.

I also agree with Judge Fletcher's characterization of Judge Kleinfeld's opinion as a plurality opinion, at least with respect to Parts III and IV. I do not think that votes by dissenting judges can be used to make a plurality opinion a majority one. Judge O'Scannlain has joined the dissenting opinion but also seeks to concur separately in Parts III and IV. His effort does not change the status of Judge Kleinfeld's opinion.

Rather than try to identify the precise statements in Judge Kleinfeld's opinion with which I agree or disagree, I will try to restate what I believe our remand means. Let me begin by saying that our remand does not limit the discretion of the district court to consider evidence outside the administrative record or recommend that the district judge decline to accept evidence that supplements that record. We simply restate the rule of *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938 (9th Cir.1995), and hold that the district court did not abuse its discretion under that standard at the time of the summary judgment proceeding. Given that, in the summary judgment proceeding, Kearney offered in

evidence only a brief definition from the Occupational Outlook Handbook and failed to specify any additional medical evidence he sought to offer beyond that already in the record before the administrator, I do not disagree with the conclusion that, for the purposes of summary judgment, the district court correctly limited the evidence to that record.

Obviously, we cannot issue rulings at this stage of the proceedings on the admissibility of evidence not yet presented to the district court, just as we cannot rule in advance on the standard of review that will be applied if the district court's decision on the merits after trial becomes the subject of a future appeal. At trial, the district court will face a new and very different problem (even though the ultimate question, whether in view of his physical and mental limitations Kearney can properly continue to practice his specialty as a trial lawyer, remains the same). Judge Kleinfeld's opinion acknowledges that we are *not* ruling in advance on the admissibility of any additional evidence that the parties may seek to present at trial; that the district court will now be required to make findings of fact and answer a different question in its review of the record; and that the district court "will retain discretion to decide, subject to *Mongeluzo*, whether, in order to answer this different question, he should take additional evidence." Kleinfeld Op. at 3890–91.

Of course, we cannot predict what additional evidence Kearney will submit and whether such evidence will meet *Mongeluzo*'s standard. Kearney may offer evi-

---

1. In fact, there was no such conflict. Conflicts exist between opinions, not between the arguments and briefs of the parties. There is no conflict between the two opinions because while the *Kearney* panel opinion, like Judge Kleinfeld's en banc opinion, carefully sets forth and construes the specific language of a policy provision, no policy provision is set forth in *Snow*, and the *Snow* opinion therefore contains no construction of any identifiable policy language, regardless of what the parties' briefs represent about the underlying facts of that case. *Cf. Kearney v. Standard*

*Ins. Co.*, 144 F.3d 597, 601 (9th Cir.1998), *reh'g granted, opinion withdrawn by* 152 F.3d 1098 (9th Cir.1998) *with Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (9th Cir.1996). As Section I of Judge Kleinfeld's opinion makes clear, it is the precise language of the policy that is critical when we attempt to analyze the legal issues involved in determining coverage. For that reason, contrary to Judge Kleinfeld's earlier statement, *Snow* was of little or no precedential value, and *Kearney* was indisputably not in conflict with it.

dence regarding the duties of a trial attorney that the district court finds more useful than the brief definition contained in the Occupational Outlook Handbook. He may also offer specific medical evidence that could not have been presented to the plan administrator. Kearney may also seek to offer other additional evidence that he did not believe necessary at the time Standard was considering his claim, but that would be pertinent at time of trial. And finally, as Judge Kleinfeld's opinion points out, the district court may decide that evidence that was previously unnecessary is now essential for the different kind of review that it will engage in on remand. We simply cannot foresee what the parties will present or argue, and we do not know how the district court will rule on such evidence when it conducts its trial on the merits.

In fact, it is quite clear that additional evidence *will* be required in order to resolve the question whether Kearney's disability precludes him from performing the material duties of his specialty as a trial lawyer. Even though the district court was within its authority to reject Kearney's evidentiary offer of the Handbook definition, there is a serious gap in the record regarding the duties of a trial attorney. The experience of one judge, which led him to conclude that the need to "avoid severe emotional stress or very hard work does not warrant the conclusion that [Kearney] cannot practice as a trial attorney," [2] is clearly not sufficient. Those of us who have been trial lawyers, particularly those familiar with the obligations of plaintiffs' trial lawyers, and the severe stress involved when one holds the future of an injured client and his family, or indeed a widow and hers, in one's hands, know that emotional stress, time pressure, long hours, a tight time schedule, and extremely hard work *are* an unavoidable part of trial practice. But rather than relying on his own or any other judge's personal experience, the district court should admit appropriate additional evidence that is offered on this question.

The factors that courts must consider in determining whether to allow additional evidence are set forth in *Quesinberry,* the case that *Mongeluzo* followed:

claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review processes with little or no evidentiary record; *the necessity of evidence regarding interpretation of the terms of the plan* rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; ... and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

*Quesinberry v. Life Ins. Co.,* 987 F.2d 1017, 1026–27 (4th Cir.1993) (en banc) (emphasis added). Kearney's claim turns on the interpretation of a key provision of the plan, the definition of the "material duties" of a trial attorney. The plan administrator's erroneous conclusion that the nature of a trial attorney's work was "sedentary;" the lack of notice to Kearney that Standard would adopt such an erroneous definition and rely on it in denying his claim; the materiality of this dispute to the resolution of Kearney's claim; the lack of any information in the evidentiary record on this question; and the effect that Standard's conflict of interest may have had on its decision-making; together necessitate the admission of additional evidence on this question at a trial on the merits. *See Mongeluzo,* 46 F.3d at 944; *Quesinberry,* 987 F.2d at 1026–27.

I agree with Judge Kleinfeld's conclusion that a full trial de novo is not necessary, and that the district court should begin with the record that was before Standard and then determine what "addi-

---

**2.** As Judge Kleinfeld's opinion notes, Dr. Weinreb had warned Kearney to avoid "very heavy work and very severe emotional stress" or working on a "very tight time schedule."

tional evidence is necessary to conduct an adequate *de novo* review." *Mongeluzo*, 46 F.3d at 944. *See also Quesinberry*, 987 F.2d at 1025. But indeed it would make no sense to remand simply to apply a different and more difficult standard—from the appellant's standpoint—to the identical record.[3] If I believed that the record before the district court was adequate, and that the district court should simply review that record without taking additional evidence, then I would agree with others on both sides that there is absolutely no purpose to a remand. I would then join Judge Silverman's persuasive opinion.

Judge Kleinfeld also includes a brief prediction that, after the district court decides this case on remand, we will review the district court's findings of fact under a clearly erroneous standard, regardless of whether the trial judge admits additional evidence, hears testimony, or merely confines his review to the record that was before the plan administrator. However, we, of course, cannot determine in advance what the standard of review will be for a case that is not before us. If the district court's findings and conclusions are based solely on the record that was before the plan administrator, there is a strong argument that our review need not be so deferential. "District court review of agency action is generally accorded no particular deference, because the district court, limited to the administrative record, is in no better position to review the agency than the court of appeals." *Great Western Bank v. Office of Thrift Supervision*, 916 F.2d 1421, 1426 (9th Cir.1990) (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1161 (9th Cir.1980)). Similarly, "[b]ecause we are in as good a position as the district court to review the findings of the bankruptcy court, we independently review the bankruptcy court's decision." *In re Marquam Inv. Corp.*, 942 F.2d 1462, 1465 (9th

Cir.1991) (quoting *Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1377 (9th Cir. 1985)). Likewise in social security disability cases we independently review the administrative law judge's decision. *See Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998). Were the district court in this instance to limit its review to the record—which it should not—the question whether to afford deference to its factual findings would be an open one. This, of course, is wholly aside from the question whether the refusal to admit the evidence would be reversible as an abuse of discretion. Because at this stage of the proceedings, we do not even know what it is that we will be reviewing, if anything, any discussion as to the applicable standard of review is, at most, dictum.

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part from Judge Kleinfeld's opinion, and joining Judge Fernandez's dissent:

I join in Judge Fernandez's dissent. I write separately only to indicate that, but for my conclusion that the policy conferred discretion upon the plan administrator, I would resolve the remaining issues as did Judge Kleinfeld in parts II, III, and IV of his opinion. I therefore concur in parts II, III, and IV of Judge Kleinfeld's opinion to that extent.

SILVERMAN, Circuit Judge, with whom FLETCHER, Circuit Judge, joins, concurring in part and dissenting in part:

I am pleased to join Parts I and II of the majority opinion. However, I fail to see the point of remanding this case for a "trial" at which the district judge will admit no new evidence, merely re-read the evidence he already read in connection with the cross-motions for summary judgment, and then render a "verdict." He's

---

3. Contrary to the optimistic ruminations of Judge Kleinfeld, I believe that a judge who granted summary judgment to the defendant on the record before us would necessarily

grant that party judgment on the merits, were he to restrict his review to that record but this time be free to draw all inferences in favor of the defendant rather than the plaintiff.

been there and done that.[1] The only question is whether the information in Standard's possession was—in the language of the plan—"satisfactory." On cross-motions for summary judgment, the district judge ruled that it is not. And that is a question of law, which itself is reviewed de novo on appeal.

With all due respect, the majority gets off the track by latching on to the contradictory evidence of Kearney's condition in Standard's possession, then finding "a genuine question of fact as to whether Kearney was disabled in the sense defined by the policy." In my view, the question at this stage is not whether Kearney is disabled. The question is whether the *evidence of disability in Standard's possession* was "satisfactory." Either it was or it wasn't. There is no dispute over *what* information Standard possessed. The only question is whether it was sufficient. *That* is the question to be reviewed de novo.

There are no factual disputes. In their cross-motions for summary judgment, the parties recognized this and so did the judge. Although Kearney and Standard disagree over the legal conclusions to be drawn from the written information that Standard had received, there is no disagreement over *what* it had received. It is "satisfactory" or it isn't.

The plan administrator doesn't conduct a trial. It pays or denies plan benefits on basis of the information in its possession, even if some of it is contradictory. In reviewing Standard's decision de novo, we are in the same boat. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 943 (9th Cir.1995). It is true that in an ERISA case, additional evidence can be received in the course of judicial review to supplement what was presented to the administrator. However,

whether to allow supplementary evidence is a matter wholly within the discretion of the district judge. *Id.* at 943–944. I agree with the majority that the district judge did not abuse his discretion in declining to receive new evidence. But, with no new evidence to consider, that leaves us where we started: de novo review of whether the proof of disability in Standard's possession was "satisfactory." That was the legal question before the district court on cross-motions for summary judgment, the question on which it ruled in favor of Standard, and where the district judge and I part company.

In my view, Kearney's motion for summary judgment should have been granted and Standard's denied. Rather than repeat it here, I commend the reader to Judge Reinhardt's powerful description of the cogent evidence Kearney submitted to prove his disability. *Kearney v. Standard Ins. Co.,* 144 F.3d 597, 600–603 (9th Cir.) rehearing granted, opinion withdrawn, 152 F.3d 1098 (1998). It is also true that Standard was in possession of information that suggested otherwise. Of course, the insurance company must not be made to pay for losses that are not covered by the plan or for claims that have not been proven. But in cases such as this one, where there is strong evidence of a covered loss, some evidence to the contrary, and no definitive way to know for sure, the benefit of the doubt should have been resolved in favor of the beneficiary. For that reason, viewing it on a de novo basis, I would have found Kearney's proof of disability to be "satisfactory" in light of the totality of the evidence in Standard's possession.

Accordingly, I would reverse the district court with directions to grant Kearney's

---

1. Judge Posner wrote in an analogous situation:

But because, as we have said, there is no right to a jury trial in an ERISA case ..., and here no evidence besides that introduced at the summary judgment stage that the parties would be presenting at a trial,

all the evidence bearing on the issue of contractual meaning was before the trier of fact at that stage. In these unusual circumstances, to remand the case for trial would be an empty formality; ...

*Mathews v. Sears Pension Plan,* 144 F.3d 461, 468 (7th Cir.1998).

motion for summary judgment and deny Standard's.

FERNANDEZ, Circuit Judge, with whom O'SCANNLAIN, and T.G. NELSON, Circuit Judges, join, dissenting.

While I see no particular point in disputing the majority's determination that this case must be remanded to the district court,[1] I do not concur with its rationale, reasoning or result. Hence I dissent because, as I see it, the keystone of the approach favored of the majority is undue caution about treating administrator authority under an ERISA plan different from insurance company authority in the non-ERISA insurance world. However, because that keystone is defective, the whole arch of the opinion must collapse. There are two major fractures in that most important voussoir.

The first fracture exists because there is no need for such great caution. This case does not involve a mere contract; it involves an ERISA plan. The difference is exceedingly important and imposes both benefits and burdens upon any entity which is acting as an administrator of a plan. For Standard, and for all other similarly situated companies, the fiduciary nature of the duties can be a double-edged sword to say the least.

In an ordinary contract case, for example, one party is not a fiduciary for the other. Even insurance is simply a special kind of contract between two consenting parties. See, e.g., Hassard, Bonnington, Roger & Huber v. Home Ins. Co., 740 F.Supp. 789, 791–92 (S.D.Cal.1990); Lunsford v. American Guarantee & Liab. Ins. Co., 775 F.Supp. 1574, 1583 (N.D.Cal.1991); Love v. Fire Ins. Exch., 221 Cal.App.3d 1136, 1147–50, 271 Cal.Rptr. 246, 252–54 (1990); Henry v. Associated Indem. Corp., 217 Cal.App.3d 1405, 1418–19, 266 Cal.

Rptr. 578, 586 (1990). That fact means that parties can be expected to, and do, deal with each other at arms length to some extent. Special doctrines do hedge, or erode, the full impact of the somewhat theoretical assumption of a true negotiation between large insurance companies and ordinary consumers. Thus, the covenant of good faith and fair dealing is implied, as it is in all contracts, but it is heightened in the insurance context and a violation of it can lead to tort liability. See e.g., Love, 221 Cal.App.3d at 1147–48, 271 Cal.Rptr. at 252–53. Nonetheless, an insurance company, like anyone else, can pursue its own interests, as long as it does not violate the terms of its contract (including the covenant of good faith). As a result, we might well feel great trepidation about finding that a contracting party has discretion, and might be quite chary about bestowing a discretionary interpretation upon the words of an insurance, or other normal, contract.

When it comes to ERISA, however, we cannot simply apply the same premises, even when an insurance company is involved. The whole arrangement is quite different when a company undertakes to act as a plan administrator. It, then, is not a mere contracting party; it is a *fiduciary*. See 29 U.S.C. §§ 1002(16)(A), 1002(21)(A). In effect, the entity creating the plan is a trustor, the administering company is a trustee, and the claimant is a beneficiary of that trust. Therefore, even though it does insure a benefit, an insurance company must act as a fiduciary must act. That actually imposes a higher duty upon it than it would undertake were it in a mere contractual relationship. It cannot simply act as a self-interested party that need only avoid violating the legal floor created by the covenant of good faith and fair dealing. It must reach much higher; it must act with the very punctilio of fair-

---

**1.** Under either of our approaches, the district court failed to apply the proper standards when it decided this case. Although it is a bit difficult to see how the district court would be inclined to reach a different result on an abuse of discretion standard, I see no need to spill ink applying that standard to the facts of this case in light of the decision that the case will be returned to the district court to apply the even stricter de novo standard.

ness. *See* 29 U.S.C. § 1104(a)(1) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries. . . ." ); *NLRB v. Amax Coal Co.,* 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981) ("[A] trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties."); *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1353 (9th Cir.1984) ("The administrator of an employee welfare benefit plan . . . has no discretion . . . to flout the . . . fiduciary obligations imposed by ERISA, or to deny benefits in contravention of the plan's plain terms."); Restatement (Second) of Trusts § 170(1)(1959) ("The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary."); Restatement (Second) of Trusts § 183 (1959) ("When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them."); *cf. Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir.1996) (The administrator's "duties are the 'highest known to the law.' ").

At the same time, it is not at all unusual to confer discretion upon a trustee; it is rather normal so to do. Thus, while it might seem a bit jarring to interpret ordinary contract language in a way that confers discretion, where one party must depend on the mere good faith of the other, it is not at all surprising to find discretionary language in an ERISA plan, where the beneficiary can insist on fiduciary behavior. In the former case, the conferral of discretion may seem downright scary; in the latter, the principles of trust law act as an anodyne for undue fears. It is true

that when there is discretion courts will only review the administrator's actions for an abuse of that discretion. *See* Restatement (Second) of Trusts § 187 (1959). However, the high principles and standards of trust law do protect the beneficiary. No fiduciary, not even an insurance company, can draw much comfort from the fact that discretion is conferred upon it, if it acts in a lax, conflicted, arbitrary, capricious, or abusive manner toward the beneficiary.[2] Nevertheless, trust law principles do not cut in only one direction. The beneficiary *is* left to the mercy of the trustee, as long as the trustee does not violate the duties imposed upon him. That uncovers the second fracture in a timorous approach—the treatment of ERISA as if it were a one-way statute.

ERISA *was* intended to protect beneficiaries, but that is not all it was intended to do. There might not be a beneficiary to protect, if employers and plan administrators were faced with constant litigation and expense when they set up their plans. Myriads of state laws, proliferating concepts of state tort liability (insurance bad faith cases for example), and litigious delays, could all conspire to make the very setting up of ERISA plans decidedly unattractive to many employers. Transaction costs, like litigation and constant judicial "refinements" over the course of hundreds of disputes, will not always enhance the efficient delivery of benefits. Thus, as we have said, "ERISA was enacted to promote and protect employer interests as well as employee interests." *Aloha Airlines, Inc. v. Ahue,* 12 F.3d 1498, 1503 (9th Cir.1993). Moreover, ERISA does "set forth a comprehensive civil enforcement scheme that represents a careful balancing

---

**2.** Of course, just when a conflict will be found is not part of the determination of whether there is discretion in the first place. Because the disposition of this case by the majority—the determination that requires us to use a de novo standard—turns on the conferral issue, there is no real point in exploring the conflict standard at this juncture. We have spoken to it in the past. *See Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1322–23 (9th Cir.

1995); *see also Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.,* 125 F.3d 794, 798 (9th Cir.1997). Other courts have also done so in varying ways and with varying results. *See, e.g., Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan,* 144 F.3d 1014, 1020 (7th Cir.) *cert. denied,* —— U.S. ——, 119 S.Ct. 372, 142 L.Ed.2d 307 (1998); *Doyle v. Paul Revere Life Ins. Co.,* 144 F.3d 181, 184 (1st Cir.1998).

of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987).

Once all of this is realized, we may take heart, become more robust, and discover that we need not strain ourselves to assure that federal courts will give a meticulous de novo review to as many ERISA decisions as possible, either because we think of insured ERISA plans as being much like ordinary contracts or because we believe that ERISA was single-mindedly directed to the maximization of each employee's recovery from available plans. That explains why, as we pointed out in *Snow v. Standard Ins. Co.,* 87 F.3d 327, 330 (9th Cir.1996), "[w]e have not been stingy in our determinations that discretion *is* conferred upon plan administrators."

Of course, timidity aside, the first step in our analysis must still be to determine whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). If it does not, review is de novo. If it does, we should, instead, review the decision for abuse of discretion. *See Snow,* 87 F.3d at 330; *Atwood,* 45 F.3d at 1321 & n. 1; *McKenzie v. General Tel. Co.,* 41 F.3d 1310, 1314 (9th Cir.1994); *Taft v. Equitable Life Assurance Soc'y,* 9 F.3d 1469, 1471 & n. 2 (9th Cir.1994). We outlined the general principles which should be applied to that determination in *Snow,* 87 F.3d at 330, and, as I see it, there is no reason to deviate from that outline at this time. We said:

> [A] proper and efficient functioning of an ERISA plan does often depend upon the use of discretion by the plan fiduciaries. As we have pointed out, a plan does confer discretion when it "includes even one important discretionary element, and the power to apply that ele-

ment is unambiguously retained by its administrator." *Bogue v. Ampex Corp.,* 976 F.2d 1319, 1325 (9th Cir.1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993). In *Bogue* that element was found in language in an employment severance plan which provided that the administrator would make determinations about similar employment positions within the company. *Id.* at 1324. In other words, if the plan administrator has the authority to determine eligibility for benefits, that inherently confers discretion upon him. *See Patterson v. Hughes Aircraft Co.,* 11 F.3d 948, 949–50 (9th Cir.1993) (per curiam); *Eley v. Boeing Co.,* 945 F.2d 276, 278 (9th Cir.1991); *Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d 1279, 1284–85 (9th Cir. 1990), *cert. denied,* 498 U.S. 1087, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991).

*Id.*

The plan in this case required that the beneficiary supply "satisfactory written proof" to Standard. In my opinion, that does not require a construction different from the one we reached in *Snow,* where we said:

> The plan before us provides that there will be no benefit payment unless Standard is presented with what it considers to be satisfactory written proof of the claimed loss. We see no relevant difference between that and plans which declare that the plan administrator will determine eligibility. It is apparent that both require the administrator to decide whether the person has become eligible as a result of presentation of satisfactory proof to that effect. *See Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 378–80 (7th Cir.1994); *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 983–84 (6th Cir.1991); *Bali v. Blue Cross & Blue Shield Ass'n,* 873 F.2d 1043, 1047 (7th Cir.1989). Therefore, the district court correctly determined that review of Standard's decision must be for an abuse of discretion.

*Id.* (footnote reference omitted). I recognize that saying "proof which is satisfactory" can be distinguished from saying "proof which is satisfactory to us." However, aside from nice scholastic debates, it is a distinction without a difference, unless, based upon some of the ephemeral concerns upon which I have already expatiated, we desire to limit the conferral of discretion as much as we can.

The Sixth Circuit put its finger on the issue and the lack of a true distinction, when it said:

> Although many of our · prior cases finding a clear grant of discretion involved ERISA plans which explicitly provided that the evidence be satisfactory "to the insurer," "to the company" or "to us," it does not automatically follow in the absence of such language discretion has not been granted to the plan administrator.... We agree with Aetna that this "right to require as part of the proof of claim satisfactory evidence" means, semantically, that the evidence must be satisfactory to Aetna, the only named party with the right to request such evidence. It naturally follows that Aetna, the receiver of the evidence, would review that evidence to determine if it constitutes satisfactory proof of total disability. It is simply implausible to think that Aetna would merely hold the evidence as a safe keeper or depository for a third party unnamed in the contract to review in making benefits determinations.

*Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 556–57 (6th Cir.1998). Just so. Our normal generous approach to the finding of discretion should dictate that Standard had discretion here.

Moreover, as far as the doctrine of *contra proferentem* is concerned, I am dubious about its application to the determination of whether discretion has been conferred upon an ERISA plan administrator, as opposed to its application to the construction of coverage and exclusion terms in a plan involving insurance. But even if it did properly apply, I see no significant ambiguity in the language at hand. *Cf. Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 538–41 (9th Cir. 1990). It is true that omission of the phrase "to us" does allow sophisticated linguists to argue that there is no discretion, even if discretion would otherwise exist. It is also true that sophisticated judges can make sophisticated alternative and competing arguments. That, to my mind, is not enough to create true ambiguity. Ambiguity has never meant that courts or judges differ. Were it so, conflicting rulings would always require a finding of ambiguity, which definitely is not the case. *See, e.g., New Castle County v. Hartford Accident and Indem. Co.,* 933 F.2d 1162, 1195–96 (3d Cir.1991) (presence of conflicting judicial decisions does not mandate a finding of ambiguity); *ACL Techs., Inc. v. Northbrook Property & Cas. Ins. Co.,* 17 Cal.App.4th 1773, 1787 n. 39, 22 Cal.Rptr.2d 206, 214 n. 39 (1993) (disagreement among judges of different jurisdictions does not establish ambiguity); *Lower Paxton Township v. United States Fidelity & Guar. Co.,* 383 Pa.Super. 558, 573 n. 4, 557 A.2d 393, 400 n. 4 (1989) (ambiguity is not found by the mechanical process of searching for conflicting court decisions). Thus, I do not think that we should be bewitched, bothered or bewildered by those levels of sophistication. In "an ordinary and popular sense" there can be little doubt that it was the administrator to whom the proof had to be satisfactory. *Perez,* 150 F.3d at 556. Equally, there can be little doubt that in the ERISA fiduciary world the satisfaction reaches the whole of the decision.

I recognize that it can be argued that the word "satisfactory" does not convey any hint of discretion, whether it is followed by the phrase "to us" or not. That seems plainly wrong. Of course, the idea of discretion does not connote limitless power. If there are objective limits to discretion, as there are in anything but the

strangest circumstances, that does not detract from its existence. Discretionary decision-making does not mean standardless decision-making. *See, e.g., Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990) (discretion abused on erroneous view of law or clearly erroneous assessment of evidence). Even referees, whose game calls are unappealable, do not act in a standardless world.

We should decide that a requirement of satisfactory proof gives the administrator the discretion to determine whether the claimant is entitled to benefits. We should then only patrol the periphery to assure ourselves, and beneficiaries, that there has not been arbitrary, capricious, or conflicted decision making. Absent that, we should let the administrator's decision stand.

A final word on parsing: In this case, the district court decided that it would conduct de novo review, but that it would rely upon the record that was before the plan administrator, rather than receive new evidence. I agree with the majority that the district court did not abuse its discretion when it did that. *See* majority opinion at pages 1090–1092; *see also Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 943–44 (9th Cir.1995). So far, so good. At that point, as I see it, the district court should have conducted a trial proceeding in which the trial record consisted of the information which was before the administrator, and should then have considered arguments regarding that record.

Here the district court mislabeled what it was doing when it called the proceeding a summary judgment, and that mislabeling has induced full scale de novo review. Had the district court used the correct label, I would suppose that we would be reviewing its factual determinations for clear error, just as we would in an appeal from any other trial. *See Russian River Watershed Protection Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1140–41 (9th Cir.1998); *Snow,* 87 F.3d at 331. But,

then, it is not too surprising when an appellate court decides to rely upon the label given to a proceeding by the district court. In fairness to the district court, however, we (and others) have previously recognized that a summary judgment based on a detailed stipulated record, which this ERISA record amounts to, can result in what is essentially a trial with review of factual determinations for clear error. *See Acuff–Rose Music, Inc. v. Jostens, Inc.,* 155 F.3d 140, 142–43 (2d Cir. 1998); *Wolfe v. United States,* 798 F.2d 1241, 1243 n. 2 (9th Cir.1986); *EEOC v. Maricopa County Community College Dist.,* 736 F.2d 510, 512–13 (9th Cir,.1984); *Starsky v. Williams,* 512 F.2d 109, 111 (9th Cir.1975). Thus, we have seen that we need not be mesmerized by labels. Also, although epiphanies do happen, I doubt that a judge who cannot even discover a basis in the evidence from which a reasonable trier of fact *could* find in favor of a party might still decide in that party's favor based on the same evidence. But let that be; at least after today's didactic exercise a district judge will be able to incant canorous phrases which will please our ears.

In fine, I resile from turning ERISA decision making into an aeonian logomachy. I would, instead, allow administrators, who have satisfactory-proof discretion, to make benefit determinations unmolested by court battles, other than those that they bring upon themselves when they violate the requirement that they act as fiduciaries for, rather than as contractual adversaries of, their beneficiaries.

Thus, I respectfully dissent.